UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DOUGLAS CAMPBELL and DENISE CAMPBELL, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST AMERICAN TITLE INSURANCE COMPANY, <br><br> Defendant. | C.A. No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY DEMANDED** |

Plaintiffs Douglas and Denise Campbell bring this action on behalf of themselves and all others similarly situated against Defendant First American Title Insurance Company ("First American").

## I. BACKGROUND

1.  First American, the nation's largest title insurer, has for years routinely overcharged Maine homeowners who refinance their home mortgages, by charging them premiums for title insurance far in excess of First American's statutorily required Maine rates. Refinancing borrowers are entitled to pay substantially reduced premiums for title insurance obtained from First American. As a matter of practice, however, First American does not disclose to these homeowners that they are entitled to hundreds of dollars in savings when they purchase title insurance, and misrepresents to them that the inflated rates they are being charged are the correct rates. First American's actions violate Maine's Insurance Code, including *inter alia,* 24-A M.R.S.A. §§ 2174, 2304-A, 2316, 2418 and 3201, and Maine common law.

2. Title insurance is typically one of the largest closing costs charged to borrowers. As a condition of extending a loan, virtually all mortgage lenders require that borrowers purchase title insurance to protect the lender's collateral if a title challenge arises. When a homeowner refinances a mortgage, lenders require new title insurance, despite the fact that there is typically no change of ownership since the original policy was issued, and no new risk.

3. Most title insurers, including First American, have at least two separate premium rates for lender's title insurance: the "standard rate" which is the full price for title insurance, and the "reissue" or "refinancing rate," which is a deeply discounted rate for refinancing customers. First American's discounted rate, which was filed with and approved by the Maine Superintendent of Insurance, is 40 per cent less than the full standard rate, for loan amounts up to the amount of the prior mortgage. On a typical refinance loan, the refinancing rate can save a borrower hundreds of dollars in premiums.

4. Title insurers offer discounted refinance rates because preparing a title policy for a refinance requires significantly less work than preparing an initial policy, and covers minimal risk. Because there is typically no change in ownership and only a short period of time has elapsed, title insurers can rely on the comprehensive title search conducted with the original policy, and need only perform a limited search covering the period since the original policy. Additionally, because the original policy remains in effect, the coverage of the new policy is limited to title-related claims that arise during the short period of time in between the placement of the original and refinance policies.

5. With interest rates at historical lows over the past six years, record numbers of homeowners refinanced their mortgages, and as a result title insurer profits

soared. *See* Roger Vincent, *2 Title Insurers Report Soaring Profits*, Los Angeles Times 2, April 24, 2003 (noting that First American's net income doubled from $44.1 million in 2002 to $87.6 million in 2003). Title insurers, including First American, however, have reaped enormous profits by disregarding their own established refinancing rates and overcharging refinancing homeowners.

6.  At the same time, title insurance companies have so grossly inflated the price of title insurance that they only pay out only 5% of their premiums in claims, compared with auto and homeowner insurers which pay about 70%. *See* Scott J. Wilson, *The Title Insurance Toll,* L.A. Times C-1, February 10, 2008. Typically, up to 80% of the title insurance premium is paid as a commission to the insurance agents and closing attorneys who issue the insurance to borrowers. *See* Scott Woolley, *Inside America's Richest Insurance Racket,* Forbes 148, November 13, 2006 Volume 178; Issue 10.

7.  In Maine, under Title 24-A of the Maine Revised Statutes, "The Maine Insurance Code," all rates for title insurance must be filed with and approved by the Superintendent of Insurance. Once rates are approved, insurers are statutorily required to charge *only* those approved rates and are prohibited from deviating from these rates.  As set forth below, First American violated these statutory requirements by failing to charge the statutorily required discount rates and overcharging Maine borrowers thousands of dollars in excessive premiums.

## II. JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A), in that this is a "civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class

action in which . . . any member of a class of Plaintiff is a citizen of a State different from any Defendant." *Id*. The named Plaintiffs are citizens of Maine, and the First American is a citizen of the State of California.

9. Venue is appropriate inasmuch as the Plaintiffs are residents of Maine. Venue is also proper in this Court because First American systematically and continuously transacts business in Maine and the causes of action set forth in this Complaint, in part, arose in Maine. The transaction at issue took place in Maine, and the property for which title insurance was purchased is located in Maine.

### III. THE PARTIES

10. Plaintiff Douglas Campbell is an individual who resides in Chebeague, Maine.

11. Plaintiff Denise Campbell is an individual who resides in Chebeague, Maine. Douglas and Denise Campbell are spouses.

12. Defendant First American is a California corporation with a principal place of business in California.

### IV. CLASS ALLEGATIONS

13. This class action is brought on behalf of the Plaintiffs and Class Members (defined below) to recover for the harm caused by First American's pattern of deceptive acts and practices as alleged herein.

14. Throughout the Class Period (defined below), First American injured Class members by charging premiums at rates in excess of its statutory rate and by failing to disclose to Class members that they were entitled to pay discounted rates. First

American affirmatively and deliberately overcharged these consumers to the detriment of Plaintiffs and the other members of the Class.

15. The acts, practices and conduct of which Plaintiffs complain commonly affect a class consisting of persons who, at any time during the six years preceding the filing of this complaint to the present (the "Class Period"):

    a. refinanced a mortgage on residential property in Maine,

    b. purchased title insurance from First American in connection with the refinancing,

    c. qualified for the refinance rate because they had entered into a mortgage within the two years prior to refinancing that was insured by a title insurance company licensed in Maine, and

    d. paid an amount more than First American's statutorily approved refinance rate for a lender's title insurance policy.

16. The Class, as defined above, is identifiable and unambiguous based on objective information and criteria.

17. The Campbells are members of the Class.

18. The Class is so numerous that joinder is impractical. Upon information and belief, the Class comprises thousands of individuals.

19. There are questions of law and fact common to the members of the Class, which questions predominate over any individual issues.

20. The claims and defenses of the Campbells are typical of the claims of all members of the Class. By proving their case, the Campbells will simultaneously prove the case of the members of the Class.

21. The Plaintiffs will fairly and adequately represent the Class. Plaintiffs are willing and able to serve as representatives of the Class, and they have no knowledge of

any possible divergent interest between or among Plaintiffs and any member of the Class. Plaintiffs have retained highly competent counsel experienced in class actions and complex litigation to provide representation on behalf of the Plaintiffs and the Class.

22. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

23. The prosecution of separate actions would also create a substantial risk of adjudications with respect to individual members of the Class, which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

24. Questions of law and fact common to members of the Class predominate over any questions affecting individual members. The determinative facts and legal principles apply universally among Plaintiffs and the members of the Class. Indeed, the predominant legal issue in this case, which cuts across the entire Class, is whether First American breached a legal duty universally owed to the Plaintiffs and the members of the Class in failing to charge the statutorily required discounted refinance rate and/or failing to disclose the existence of the discounted refinance rate. If liability against First American is established on the basis of the common facts applied to universally applicable principles of law, then damages can be precisely calculated based on objective data.

25. A class action is superior to other available methods for the fair and efficient adjudication of the controversy for reasons including that, due to the expense of

pursuing individual litigation regarding First American's common course of conduct alleged herein, members of the Class would, as a practical matter, be effectively precluded from protecting and enforcing their legal rights.

## V. FACTUAL ALLEGATIONS

*First American's Filed And Approved Premium Rates*

26. On November 25, 1996 First American requested that the following rates be approved for its lender title insurance policies: (a) a standard rate of $1.75 per $1,000 of mortgage amount (for loans up to $1 million), and (b) a refinance rate of $1.00 per $1,000 of mortgage amount up to the amount of the previous coverage, with the standard rate applicable to any increase in the mortgage amount. *See,* November 25, 1996 Letter to Superintendent of Insurance, attached as Exhibit A. These rates remain in effect through the present.

27. First American's Maine Rate Schedule provides that the refinance rate is available to a "borrower who refinances an existing mortgage with any lender within two years, which mortgage was insured by a title insurance policy issued by a title insurance company licensed to do business in the state of Maine at the date of issuance." *See* Amendment of Title Insurance Rate Schedule, September 29, 1993, attached as Exhibit B.

28. First American furnished its agents with state-specific guidelines that provide that a recorded institutional mortgage in the chain of title during the prior two-year period is sufficient to qualify a borrower for the refinance rate discount in Maine.

*Plaintiffs' Transactions*

29. Plaintiffs Douglas and Denise Campbell (the Campbells) entered into a mortgage loan with T & M Mortgage Solutions in the amount of $150,000 on or about October 1, 2004. *See* October 1, 2004 HUD-1, attached as Exhibit C.

30. In connection with the mortgage, the Campbells paid a total of $362.50 to purchase a lender's title insurance issued by Chicago Title. *Id.* The total charge included a $262.50 premium (at the rate of $1.75 per $1000), plus two endorsements at $25.00 each and a survey affidavit for $50.00. *See* First Title of Maine Statement of Services Rendered, attached as Exhibit D.

31. Approximately nine months later, on or about July 14, 2005, the Campbells refinanced their mortgage with a new loan from Ameriquest Mortgage Company, in the amount of $277,100 (the "Transaction"). *See,* July 14, 2005 HUD-1, attached as Exhibit E. Their title insurer in the Transaction was First American, and the closing was conducted by First American's agent Geoffrey B. Ginn & Associates, P.C. *Id.*

32. In the Transaction, the Campbells paid a title insurance premium of $611.15. Of this premium $428.05 went to Ginn & Associates, while $183.45 went to First American. *Id.*

33. The Campbells were not given the discounted refinance rate even though they refinanced their mortgage within two years of the issuance of the prior policy, and the prior policy was issued by a title insurer licensed to do business in Maine. Instead, the Campbells' premium was apparently based on the standard rate of $1.75 per $1,000

(yielding a premium of $485.00), and included three endorsements ($75.00) plus a survey affidavit ($50.00).  *See* First American Title Policy, attached as Exhibit F, at p. 2.

34. Had the Campbells been charged the lawful refinancing rate, their premium would have totaled only $497.00, a difference of $114.15.  The discounted rate would be $1.00 per $1000 up to $150,000, plus $1.75 per $1,000 for the amount over $150,000 ($1.75 x $127,100), plus the three endorsements at $25.00 each and the survey affidavit at $50.00.

35. The Campbells' review of the HUD-1 form, which included the representation regarding the premium for the title insurance policy, took place during the closing process, prior to payment of the title insurance premium, which occurred with the exchange of funds at the closing.

36. In connection with the closing of the July 14, 2005 loan, First American, through its agent: (a) concealed from the Campbells that they qualified for and were entitled to receive the discounted refinance rate and (b) supplied false, misleading, inaccurate and incomplete information about the applicable rate for title insurance by charging the Campbells the standard rate, $611.15, for title insurance. First American's non-disclosures and false, misleading, inaccurate and incomplete statements were material to the transaction.

37. In comparable transactions involving each member of the Class, all Class members qualified for and were entitled to receive a discounted refinance rate because the Class members refinanced and obtained a new loan policy, and their premises had been previously insured within two years from the date their new loan policies were issued.

38. That the transactions were refinancings was reflected in the chain of title and closing documents for the Campbells' and Class members' properties and, therefore, First American knew or should have known that the Campbells and Class members qualified for, and were entitled to receive, a discounted refinance rate.

39. First American, however, failed to give the discounted refinance rate to the Campbells or Class members or to inform the Campbells or Class members that they qualified for such rates. Instead, First American charged the Campbells and Class members premium rates in excess of the required refinance rates, resulting in financial harm to the Campbells and Class members.

40. First American has maintained, and continues to maintain, a common, routine and customary business practice of: (a) overcharging consumers by failing to charge refinance rates to numerous residential customers who qualify for such rates in connection with refinance transactions; and (b) failing to inform such customers that they qualify for such rates.

41. As a result of the foregoing business practices, numerous residential customers who qualify for refinance rates, such as the Campbells and Class members, do not receive such discounted refinance rates and are not informed of the availability of or that they qualify for such discounted rates.

42. Plaintiffs and the members of the Class seek, *inter alia*, damages representing the difference between the amount of premium for title insurance charged by First American without the refinance rate discount and the amount of premium for title insurance that should have been charged if the refinance rate discount had been provided by First American as required by law.

43. Unless the Court issues an order declaring this practice to be illegal, and enjoining it in the future, Plaintiffs and the members of the Class will continue to be harmed by this deceptive and illegal practice.

### COUNT I
### (Breach of Contract)

44. Plaintiffs hereby incorporate by reference each and every allegation contained in the foregoing paragraphs of this Complaint as if fully alleged herein.

45. First American formed an agreement and entered into a contract with each of the Plaintiffs and with Class members including offer, acceptance, and consideration (hereinafter called the "Contract"). *See* Policy, Exhibit F.

46. First American entered into an implied in fact contract with the Plaintiffs and each Class member, which included offer, acceptance, and consideration.

47. Pursuant to the Contract, Plaintiffs and Class members paid money to First American in exchange for its providing a lender's policy of title insurance to Plaintiffs' and Class Members' lenders, so that they could obtain mortgage refinancing. First American received premiums in exchange for the issuance of a policy of title insurance. By statute, the Contract includes, without limitation, First American's obligation to charge a premium in accordance with its filed and approved Maine rates. 24-A M.R.S.A. §2304-A; 24-A M.R.S.A. §2316 ("No insurer shall make or issue a contract or policy, except in accordance with the filings which are in effect for the insurer as provided in this chapter …"); 24-A M.R.S.A. §2418(1) (a policy issued in violation of this title but otherwise binding on the insurer shall be held valid but shall be construed as provided in this title); 24-A M.R.S.A. §2418(2) ("Any condition, omission or provision not in compliance with the requirements of this Title and contained in any policy, rider, or

endorsement hereafter issued and otherwise valid, shall not thereby be rendered invalid but shall be construed and applied in accordance with such condition, omission or provision as would have applied had the same been in full compliance with this Title").

48. By operation of law, if the Contract contains any term that violates the applicable provisions of the Insurance Code, it will be construed as to meet the requirements of the Code. 24-A M.R.S.A. §§ 2316, 2418. Thus by operation of law, the Contract includes First American's discounted refinance rate.

49. Implied in the contract is also First American's obligation to comply with the requirements of the Insurance Code, and to operate in good faith.

50. Plaintiffs and Class members performed their obligations under the Contract by paying the premiums charged by First American.

51. First American breached the Contract by, without limitation, (a) charging Plaintiffs and Class members more than the contract, as it must be construed, allows by failing to charge them the discounted refinance rate in accordance with First American's filed and approved rates; and (b) failing to inform Plaintiffs and Class members that they qualified for such discounted rates.

52. As a direct and proximate result of First American's breach of contract, Plaintiffs and Class members have suffered damages in an amount to be proven at trial.

### COUNT II
### (Unjust Enrichment)

53. Plaintiffs hereby incorporate by reference each and every allegation contained in the foregoing paragraphs of this Complaint as if fully rewritten herein.

54.     First American has benefited by charging, collecting and retaining title insurance premiums in excess of the statutorily required discounted refinance rates to which the Plaintiffs and Class members were entitled.

55.     First American unjustly charged the Plaintiffs and Class members for such benefits.

56.     As a direct and proximate result of First American's charging, collection, and retention of the excessive rates, Plaintiffs and Class members have suffered damages in an amount to be proven at trial.

### COUNT III
### (Money Had and Received)

57.     Plaintiffs hereby incorporate by reference each and every allegation contained in the foregoing paragraphs of this Complaint as if fully rewritten herein.

58.     First American wrongfully charged Plaintiffs and Class members monies by charging, collecting, and retaining title insurance premiums in excess of the discounted refinance rates to which Plaintiffs and Class members were entitled (the "monies").

59.     Plaintiffs and Class members paid the monies to First American inadvertently and by mistake, and Plaintiffs and Class members were free from any moral or legal obligation to make such payment.

60.     First American is wrongfully in possession of the monies which in equity and good conscience it has no right to retain.

61.     First American has benefited from receipt of the monies.

62.     Plaintiffs and Class members are entitled under principles of equity and good conscience to the return of the monies.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request an Order from this Court:

(a) Certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing the Plaintiffs as Class representatives and Plaintiffs' counsel as class counsel;

(b) Declaring that Plaintiffs and the Class qualified for refinance rates in connection with their refinance transactions;

(c) Declaring that First American was obligated to give discounted refinance rates to Plaintiffs and the Class, and to inform Plaintiffs and the Class that they qualified for such discounted rates;

(d) Declaring that First American violated Maine law by charging rates in excess of those permitted by law and by failing to inform Plaintiffs and the Class that they qualified for reduced rates;

(e) Issuing a permanent injunction requiring First American to identify and notify in writing all residential consumers who paid premiums for the purchase of title insurance from it of the conditions upon which they may qualify for a discounted refinance rate;

(f) Ordering First American to refund the illegal amounts charged to Plaintiffs and the Class;

(g) Awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

(h) Awarding pre-judgment interest; and

(i) Award attorneys fees and costs.

(j) For such other and further relief as allowed by law and/or as is equitable under the circumstances.

        Respectfully submitted,
        On behalf of the Plaintiffs,
        By their attorneys,

        <u>/s/ James F. Molleur</u>
        James F. Molleur

        <u>/s/ Andrea Bopp Stark</u>
        Andrea Bopp Stark
        Molleur Law Office
        419 Alfred Street
        Biddeford, Maine 04005-3747
        207-283-3777
        207-283-4558 (fax)


        Gary Klein
        Elizabeth Ryan
        Roddy Klein & Ryan
        727 Atlantic Avenue, 2nd floor
        Boston, MA 02111
        Fax (617) 357-5030
        ryan@roddykleinryan.com

        Andrew S. Friedman
        Garrett W. Wotkyns
        BONNETT, FAIRBOURN,
        FRIEDMAN, & BALINT, P.C.
        2901 N. Central Avenue, Suite 1000
        Phoenix, Arizona 85012
        (602) 274-1100
        gwotkyns@BFFB.com



Dated: September 16, 2008

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiffs demand trial by jury on all issues so triable.


        <u>/s/ James F, Molleur</u>
        James F. Molleur

Case 2:08-cv-00311-GZS Document 1 Filed 09/17/08 Page 16 of 16 PageID #: 16