UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DOUGLAS CAMPBELL and DENISE CAMPBELL, on behalf of themselves and others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Docket No. 08-cv-311-P-S ) |
| FIRST AMERICAN TITLE INSURANCE COMPANY, | ) ) ) |
| Defendant. | ) ) |

ORDER ON MOTION TO DISMISS

Plaintiffs Douglas and Denise Campbell ("the Campbells") bring this class action complaint on behalf of themselves and others who paid premiums for the purchase of title insurance from Defendant First American Title Insurance Company ("First American") in connection with refinance transactions, qualified for discounted refinance rates, and did not receive those discounted rates. Before the Court is Defendant's Motion to Dismiss (Docket # 19). The Court heard oral argument on June 24, 2009, and now DENIES the motion.

I. **LEGAL STANDARD**

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the "legal sufficiency" of a complaint. Gomes v. Univ. of Maine Sys., 304 F. Supp. 2d 117, 120 (D. Me. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility

standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citation and internal punctuation omitted).

Of course, the Court must accept as true all well-pleaded factual allegations in a complaint and draw all reasonable inferences in a plaintiff's favor. See id. at 1949-50; S.E.C. v. Tambone, 550 F.3d 106, 118 (1st Cir. 2008). In distinguishing sufficient from insufficient pleadings, "a context-specific task," the Court must "draw on its judicial experience and common sense." Ashcroft, 129 S.Ct. at 1950.

## II. FACTUAL BACKGROUND

Title insurance protects "owners of property or others having an interest therein . . . against loss by encumbrance, or defective titles, or invalidity, or adverse claim to title." 24-A M.R.S.A. § 709. Under Maine law, title insurance rates must be filed with and approved by the Superintendant of Insurance. See id. §§ 2302(1)(D), 2304-A. Moreover, a title insurer may not "make or issue a contract or policy, except in accordance with" those approved filed rates. Id. § 2316.

Like many title insurers, First American offers several premium rates for lender's title insurance, including a standard rate as well as a discounted rate for refinancing customers. As of November 1996, the following First American rates were approved: a standard rate of $1.75 per $1,000 mortgage principal (up to $1,000,000), and a refinance rate of $1.00 per $1,000 mortgage principal up to the amount of the previous mortgage, with any excess calculated at the standard rate. First American's Maine Rate Schedule provides that the refinance rate is available to any "borrower who refinances an existing mortgage with any lender within two years, which mortgage was insured by a title

2

insurance policy issued by a title insurance company licensed to do business in the state of Maine at the date of issuance." (First Am. Class Action Compl. (Docket # 4) ¶ 27; Ex. B to Compl. (Docket # 1-3) at 2.)

In October 2004, the Campbells executed a first mortgage loan in the amount of $150,000.[1] At that time, they purchased a lender's policy of title insurance issued by Chicago Title Insurance Company. The Campbells paid $362.50 for the policy: a $262.50 premium (calculated at a rate of $1.75 per $1,000 mortgage principal) plus $100 for endorsements and a survey affidavit.

Approximately nine months later, in July 2005, the Campbells refinanced their mortgage with Ameriquest Mortgage Company in the amount of $277,100. Attendant to the refinancing, First American's agent Geoffrey B. Ginn & Associates, P.C., issued a new lender's policy of title insurance. The Campbells paid $611.15 for the policy; apparently, this payment was calculated at First American's standard rate, yielding an approximate premium of $485, plus $125 for endorsements and a survey affidavit. Had the Campbells been charged the discounted refinance rate, their adjusted approximate premium would have been $372, a difference of $113.

Plaintiffs now allege that in connection with the July 2005 refinancing, "First American, through its agent: (a) concealed from the Campbells that they qualified for and were entitled to receive the discounted refinance rate and (b) supplied false, misleading, inaccurate and incomplete information about the applicable rate for title insurance by charging the Campbells the standard rate, $611.15, for title insurance." (First Am. Class

---

[1] Although Plaintiffs' Complaint alleges that the initial lender was T&M Mortgage Solutions, the exhibits attached to the Complaint indicate that the lender was the "John E. Streeter Revocable Trust." (See First Am. Class Action Compl. (Docket # 4) ¶ 29; Ex. C to Compl. (Docket # 1-4) at 1.) Plaintiffs' counsel acknowledged the latter party as the initial lender during oral argument.

3

Action Compl. (Docket # 4) ¶ 36.) Moreover, they allege that First American "knew or should have known that the Campbells and Class members qualified for, and were entitled to receive, a discounted refinance rate." (Id. ¶ 38.) Finally, Plaintiffs allege that First American maintains "a common, routine and customary business practice" of overcharging eligible consumers. (Id. ¶ 40.) Plaintiffs conclude that First American's conduct violated the Maine Unfair Trade Practices Act ("UTPA") and state common law,[2] and seek injunctive and compensatory relief.

First American asserts five independent grounds for dismissal: (1) Plaintiffs did not exhaust the administrative remedies provided by the Maine Insurance Code; (2) Plaintiffs fail to state a claim for violation of the UTPA because title insurance rates are statutorily exempt; (3) Plaintiffs fail to state a claim for violation of the UTPA because they did not identify any unfair or deceptive practice that caused them injury; (4) Plaintiffs fail to state a claim for breach of contract because they did not identify any agreement between themselves and First American; and (5) Plaintiffs fail to state a claim for unjust enrichment because the Maine Insurance Code does not permit a private cause of action for overcharge claims.

### III. DISCUSSION

#### A. Failure to Exhaust Administrative Remedies

The Maine Insurance Code provides a statutory remedy for any person aggrieved by application of an insurance rating system. Specifically, section 2320(2) provides:

> Every rating organization, advisory organization and insurer shall provide within this State reasonable means whereby any person aggrieved by the application of its rating system may be heard, in person or through an authorized representative, on written request to review the manner in which

---

[2] Specifically, Plaintiffs assert state-law claims for breach of contract (Count 2), unjust enrichment (Count 3), and money had and received (Count 4). (See First Am. Class Action Compl. (Docket # 4) ¶¶ 54–72.)

4

such rating system has been applied in connection with the insurance afforded that person. If the rating organization, advisory organization or insurer fails to grant or reject such request within 30 days after it is made, the applicant may proceed in the same manner as if that application had been rejected. Any party affected by the action of such rating organization, advisory organization or such insurer on such request may, within 30 days after written notice of such action, appeal to the superintendent, who, after a hearing held upon not less than 10 days' written notice to the appellant and to such rating organization, advisory organization or insurer, may affirm or reverse such action.

24-A M.R.S.A. § 2320(2). Subsection three permits a direct application to the Superintendent of Insurance. See id. § 2320(3). In either case, judicial review of the Superintendent's actions may be taken in conformity with the Maine Administrative Procedure Act. See id. § 236. Plaintiffs have not requested review of the charged premiums from any party. First American contends that Plaintiffs' failure to exhaust section 2320's administrative remedies warrants dismissal.

Several federal and state courts have considered the consequences of a borrower plaintiff's failure to avail herself of similar administrative remedies. Until quite recently, the consensus was that exhaustion is not required.[3] However, courts interpreting Pennsylvania and Maryland law have lately taken the opposite view, dismissing plaintiffs' complaints for failure to exhaust administrative remedies.[4] For the following reasons, the

---

[3] Johnson v. First Am. Title Ins. Co., 2008 WL 4850198 (D. Ariz. Nov. 7, 2008); Slapikas v. Defendant Title Ins. Co., 2008 WL 793919 (W.D. Pa. Mar. 24, 2008); Markocki v. Old Republic Nat'l Title Ins. Co., 527 F. Supp. 2d 413 (E.D. Pa. 2007); Randleman v. Fidelity Nat'l Title Ins. Co., 465 F. Supp. 2d 812 (N. D. Ohio 2006); Barnes v. First Am. Title Ins. Co., 2006 WL 2265553 (N.D. Ohio Aug. 8, 2006); Chesner v. Stewart Title Guar. Co., 2006 WL 2252542 (N.D. Ohio Aug. 4, 2006); Cohen v. Chicago Title Ins. Co., 2006 WL 1582320 (E.D. Pa. June 5, 2006); Mitchell v. Chicago Title Ins. Co., 2004 WL 2137815 (Minn. Dist. Ct. Aug. 13, 2004); see also Hoving v. Lawyers Title Ins. Co., 256 F.R.D. 555, 573 (E.D. Mich. 2009) (noting "apparent lack of merit" in exhaustion defense).

[4] Arthur v. Ticor Title Ins. Co. of Florida, 2008 U.S. Dist. LEXIS 23485 (D. Md. Mar. 11, 2008), aff'd, 2009 WL 1703151 (4th Cir. June 18, 2009); McDuffie v. Stewart Title Guar. Co., No. 08-cv-5038, slip. op. (E.D. Pa. Mar. 20, 2009) (attached at Docket # 28-3); Amato v. United Gen. Title Ins. Co., 2009 WL 691983 (E.D. Pa. Mar. 17, 2009); White v. Conestoga Title Ins. Co., 2008 WL 2227297 (Ct. of Common Pleas of Phila. County, Pa. Apr. 21, 2008); Uyehara v. Guar. Title & Trust Co., 2008 WL 2227295 (Ct. of Common Pleas of Phila. County, Pa. Apr. 21, 2008).

Court believes that the majority of courts refusing to require exhaustion have the better of the debate.

The Court begins, as it must, with the plain language of the Maine statute. Irving Pulp & Paper, Ltd. v. State Tax Assessor, 879 A.2d 15, 18 (Me. 2005). Section 2320(2) states that "any person aggrieved by the application of its rating system may be heard . . . on written request to review the manner in which [the] rating system has been applied in connection with the insurance afforded that person." Plaintiffs maintain that the word "may" indicates that section 2320's administrative remedies are permissive rather than mandatory.

To be sure, the word "may" typically signifies mere "authorization or permission to act," not a "mandatory duty." 1 M.R.S.A. § 71(9-A); see also Markocki v. Old Republic Nat'l Title Ins. Co., 527 F. Supp. 2d 413, 417 (E.D. Pa. 2007); Cohen v. Chicago Title Ins. Co., 2006 WL 1582320, at *2 (E.D. Pa. June 5, 2006). However, this rule is not absolute,[5] and the Court believes that the word "may" in section 2320 merely acknowledges that an aggrieved person might not bring any claim at all. As Judge Schiller explained: "the word 'may' . . . gives the insured discretion to pursue an appeal to the commissioner, but does not render the entire remedy discretionary." Amato v. United Gen. Title Ins. Co., 2009 WL 691983, at *5 (E.D. Pa. Mar. 17, 2009); see also Johnson v. First Am. Title Ins. Co., 2008 WL 4850198, at *2 (D. Ariz. Nov. 7, 2008).

---

[5] In Baker v. Klein, 655 A.2d 367, 369 (Me. 1995), the Law Court required exhaustion under a statutory scheme that used the word "may." Baker, then, militates against Plaintiffs' interpretation of section 2320 as permissive. It does not, however, compel the conclusion that section 2320 is mandatory: Baker involved a plaintiff's challenge to the termination of his workers' compensation benefits due to fraud, and thus arose in the traditional context of appeals of final administrative action.

In light of this lack of textual clarity, First American invokes the "long recognized" principle that a party must proceed in the administrative arena before initiating action in the courts. Ne. Occupational Exch., Inc. v. Bureau of Rehab., 473 A.2d 406, 408 (Me. 1984); see also Levesque v. Inhabitants of Eliot, 448 A.2d 876, 878 (Me. 1982). But as Plaintiffs rightly counter, this principle typically arises in the context of challenges to final administrative actions:[6] "The doctrine of exhaustion of remedies requires a party who seeks an administrative remedy or who challenges an administrative action to pursue that remedy or challenge to a conclusion before the administrative agency prior to initiating action in the courts." Town of Levant v. Seymour, 855 A.2d 1159, 1164 (Me. 2004). Where, as here, a plaintiff disputes a private insurer's routine application of its filed rates—not an agency's approval of those rates or the reasonableness of the rates themselves—the doctrine of exhaustion of remedies has substantially less force. See Randleman v. Fidelity Nat'l Title Ins. Co., 465 F. Supp. 2d 812, 817 (N.D. Ohio 2006). The plain language of section 2320 and traditional exhaustion principles, then, do not resolve the question at hand.

Ultimately, three considerations persuade the Court that section 2320's administrative remedy is permissive and, consequently, that exhaustion is not required. First, the Maine Legislature knows how to make a remedy mandatory. See, e.g., McGee v. Sec'y of State, 896 A.2d 933, 939 (Me. 2006). It plainly did not do so here. Second, the Maine Constitution commands a presumption in favor of judicial access. See M.R.S.A.

---

[6] See, e.g., Hodsdon v. Town of Hermon, 760 A.2d 221, 222-23 (Me. 2000) (challenge to approval of site plan by town planning board); Ne. Occupational Exch., Inc. v. Bureau of Rehab., 473 A.2d 406, 408 (Me. 1984) (challenge to agency's decision to withdraw plaintiff's authorization to service clients); Levesque v. Inhabitants of Eliot, 448 A.2d 876, 878 (Me. 1982) (challenge to planning board's denial of subdivision application); Fisher v. Dame, 433 A.2d 366, 372 (Me. 1981) (challenge to town's decision regarding violation of zoning ordinance); Stanton v. Trs. of St. Joseph's Coll., 233 A.2d 718, 723-24 (Me. 1967) (challenge to commission's issuance of license).

7

Const. Art. 1, § 19; State v. Bilynsky, 942 A.2d 1234, 1236 (Me. 2008); Gibson v. Nat'l Ben Franklin Ins. Co., 387 A.2d 220, 223 (Me. 1978) ("In view of that provision, legislation should not be deemed to preclude an injured person from having a remedy of his own for a recognized wrong in the absence of a clear manifestation of intent to that effect."); see also Johnson, 2008 WL 4850198, at *3 (invoking similar "presumption in favor of judicial jurisdiction" to reject title insurer's exhaustion argument). Indeed, most of the few "minority view" decisions requiring exhaustion are distinguishable in this respect, for they rely on the unique preference for statutory remedies codified in Pennsylvania law. See McDuffie v. Stewart Title Guar. Co., No. 08-cv-5038, slip. op. at 9 (E.D. Pa. Mar. 20, 2009) (citing section 1504 of the Pennsylvania Statutory Construction Act); Amato, 2009 WL 691983, at *3 (same, and observing that "statutory remedies are preferred over common law" under Pennsylvania law). First American has identified no such preference in Maine law.

Finally, the Court questions whether the Superintendent of Insurance has the ability to award Plaintiffs' requested relief. Section 2320 is silent as to the Superintendant's remedial authority, and no provision of the Insurance Code appears to authorize directly an award of compensatory relief, punitive damages, or attorney's fees to an aggrieved section 2320 petitioner.[7] The likely inadequacy of the Superintendant's remedial authority suggests that Plaintiffs are not required to pursue administrative relief under section 2320. See Barnes v. First Am. Title Ins. Co., 2006 WL 2265553, at *3 (N.D. Ohio Aug. 8, 2006).

Thus, the Court follows the clear majority view and concludes that Plaintiffs' failure to exhaust administrative remedies does not warrant dismissal of their claims.

---

[7] Although First American repeatedly cites the Superintendent's broad generic enforcement authority, see 24-A M.R.S.A. §§ 211, 214, 2329, 2165-A, it has provided no evidence respecting the manner in which this authority is typically exercised.

### B.   UTPA Claim

#### 1.   Exemption

The UTPA proscribes "unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207. However, the statute exempts certain business activities of regulated entities:

> Nothing in this chapter shall apply to:
>
> 1. Regulatory boards. Transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the State . . . if the defendant shows that:
>
>> A. Its business activities are subject to regulation by a state or federal agency; and
>>
>> B. The specific activity that would otherwise constitute a violation of this chapter is authorized, permitted or required by a state or federal agency or by applicable law, rule or regulation or other regulatory approval.

Id. § 208(1).

Citing a line of cases that suggests that most highly regulatory transactions fall within the exemption, First American asserts that because the Maine Insurance Code subjects title insurance rates to comprehensive oversight, the challenged practices in this case are exempt from the UTPA. See Clark v. Monumental Life Ins. Co., 2006 WL 3511426, at *1 (D. Me. Dec. 5, 2006); Lessard v. Allstate Ins. Co., 2001 WL 1712653, at *4 (Me. Super. Ct. Mar. 12, 2001); First of Maine Commodities v. Dube, 534 A.2d 1298, 1302 (Me. 1987).

However, the First Circuit recently confirmed that more than comprehensive regulation is required: section 208(1) exempts only those transactions "otherwise permitted, not otherwise regulated." Good v. Altria Group, Inc., 501 F.3d 29, 58 (1st Cir.

2007) (emphasis in original), aff'd, 129 S.Ct. 538 (2008); see also Provencher v. T&M Mortgage Solutions, Inc., 2008 WL 2447472, at *7 (D. Me. June 18, 2008) ("The defendants do not identify any of their actions, which the plaintiff has alleged violated the UTPA, as being specifically permitted by any statute or regulation. This omission is determinative.") (emphasis added); Bruce A. McGlauflin, The Exception That Threatens to Swallow the Statute: The Statutory Exception to Maine's Unfair Trade Practice Act, 21 Me. B.J. 152, 152-53 (Summer 2006) (criticizing Maine courts for having "all but ignored the phrase 'otherwise permitted,' interpreting the exception to exempt any transactions that are merely subject to government regulation").

Good and Provencher limit the scope of section 208(1) to its plain language: in order to qualify for the exemption, the allegedly illegal conduct must be subject to agency regulation and be "authorized, permitted or required" by law. Here, Maine law explicitly prohibits the challenged conduct. See 24-A M.R.S.A. § 2316. Thus, the exemption does not apply.

### 2. Failure to State a Claim

To state a claim under the UTPA, a plaintiff must allege that the transaction involved "goods, services or property, real or personal, primarily for personal, family or household purposes" and that she suffered "any loss of money or property, real or personal," as a result of an unfair or deceptive practice. 5 M.R.S.A. § 213(1). As the Law Court recently elaborated:

> As to unfairness, we have held that to be unfair an act must cause, or be likely to cause, substantial injury that is not reasonably avoidable by consumers, and the harm is not outweighed by a countervailing benefit to consumers or competition. As to deceptive acts, we have adopted the clear and understandable standard, which states that an act or practice is deceptive if it is a material representation, omission, act or practice that is

10

> likely to mislead consumers acting reasonably under the circumstances. An intent to deceive is not required.

MacCormack v. Brower, 948 A.2d 1259, 1261 n.2 (Me. 2008) (citations and internal punctuation omitted). "A material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." State v. Weinschenk, 868 A.2d 200, 206 (Me. 2005) (citation and internal punctuation omitted). "In pricing cases under the Act the inquiry is whether the price has the effect of deceiving the consumer, or inducing her to purchase something that she would not otherwise purchase." Tungate v. MacLean-Stevens Studios, Inc., 714 A.2d 792, 797 (Me. 1998).

The broad language of the UTPA indicates that a failure to disclose information may constitute a deceptive act even in the absence of a legal duty compelling disclosure. MacCormack, 948 A.2d at 1261 n.2 (material omission may be deceptive); cf. Binette v. Dyer Library Ass'n, 688 A.2d 898, 907 (Me. 1996). Indeed, "[a]n act may be unfair or deceptive even when unknowingly perpetrated." Binette, 688 A.2d at 906; see also id. ("[Defendants] argue that omission by silence cannot constitute an unfair or deceptive act. They also argue that an unknowing failure to disclose a material fact cannot constitute an unfair or deceptive act. We construe the [UTPA] otherwise."); In re Hannaford Bros. Co. Customer Data Sec. Breach Litig., 2009 WL 1316178, at *10 (D. Me. May 12, 2009) ("conduct may be deceptive even though the merchant operated in good faith or without the intent to deceive").

Plaintiffs allege that First American engaged in the following unfair trade practices: first, misrepresenting that the premiums Plaintiffs were charged were the correct applicable premiums; second, failing to disclose to Plaintiffs that they were entitled to discounted

11

premiums; and third, charging Plaintiffs in excess of the applicable refinancing rate contained in its approved rate filings. (See First Am. Class Action Compl. (Docket # 4) ¶ 48(a)-(c).) First American maintains that Plaintiffs have not adequately pleaded any unfair or deceptive practice. Again, the Court must scrutinize Plaintiffs' Complaint to determine whether it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft, 129 S.Ct. at 1949 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 570).

Critically, Plaintiffs assert that First American "knew or should have known that the Campbells and Class members qualified for, and were entitled to receive, a discounted refinance rate." (First Am. Class Action Compl. (Docket # 4) ¶ 38.) They support this allegation with several well-pleaded factual allegations: that the standard practice of issuing a lender's policy of title insurance in a refinancing involves an examination of the borrower's initial policy (see id. ¶ 4); that any borrower who refinances "an existing mortgage with any lender within two years, which mortgage was insured by a title insurance policy issued by a title insurance company licensed to do business in the state of Maine at the date of issuance," is eligible for First American's refinance rate (id. ¶ 27); that First American issued the lender's policy of title insurance in the Campbells' refinancing (id. ¶ 31); that First American received a premium for issuing such policy (id. ¶ 32); that the HUD-1 form was reviewed during the refinancing closing (id. ¶ 35); and that the refinancing transaction was reflected as such in the chain of title and closing documents (id. ¶ 38). Thus, Plaintiffs' complaint contains "sufficient factual matter, accepted as true," Ashcroft, 129 S.Ct. at 1949, to support the conclusion that First American knew or should have known that the Campbells qualified for the refinance rate.

Several courts have concluded that an insurer's failure to disclose or to charge a discounted rate, when that insurer has reason to know that the borrower is eligible for such rate, may be unfair or deceptive. See Provencher, 2008 WL 2447472, at *14; Lewis v. First Am. Title Ins. Co., 2007 WL 2815041, at *6 (D. Idaho Sept. 25, 2007); Barnes, 2006 WL 2265553, at *2; cf. Chesner v. Stewart Title Guar. Co., 2009 WL 585823, at *8 (N.D. Ohio Jan. 9, 2009) (plaintiff failed to adduce evidence that each class member was eligible for discounted rate). First American's alleged knowing failure to disclose and to charge Plaintiffs the refinance rate was similarly deceptive here, particularly in light of the relative financial sophistication of the parties. See GxG Mgmt., LLC v. Young Bros. and Co., Inc., 457 F. Supp. 2d 47, 50 (D. Me. 2006) (considering, in context of UTPA claim, whether injury was "reasonably avoidable by consumers"). Moreover, Plaintiffs' alleged monetary loss represents an approximately 23% overcharge and therefore constitutes a sufficient injury; indeed, Maine courts appear to have settled for far less. See State v. Shattuck, 747 A.2d 174, 179 (Me. 2000); see also Lentini v. Fidelity Nat'l Title Ins. Co., 479 F. Supp. 2d 292, 303 (D. Conn. 2007).

Assuming, as the Court must at this stage, that First American knew or should have known that the Campbells were eligible for the refinance rate, Plaintiffs have stated a claim under the UTPA. Thus, the Court DENIES Defendant's Motion to Dismiss (Docket # 19) Count 1.

### C. Breach of Contract Claim

The parties' contract dispute focuses on the theory of implied contract.[8] An implied contract "refers to that class of obligations which arises from mutual agreement and intent to promise, when the agreement and promise simply have not been expressed in words." Stanton v. Univ. of Maine Sys., 773 A.2d 1045, 1050 (Me. 2001) (citation and internal punctuation omitted). "A contract exists if the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite to enable the court to ascertain its exact meaning and fix exactly the legal liabilities of each party." Sullivan v. Porter, 861 A.2d 625, 631 (Me. 2004). "The contract may be implied from conduct, but the need for an agreement or an understanding on the party of the contracting parties is indispensible." Cambridge Mut. Ins. Co. v. Patriot Mut. Ins. Co., 323 F. Supp. 2d 95, 105 (D. Me. 2004).

Plaintiffs allege that they entered into "an implied in fact contract" with First American. (First Am. Class Action Compl. (Docket # 4) ¶ 56.) This contract purportedly included terms of offer, acceptance, and consideration: specifically, Plaintiffs allege that they paid money to First American in exchange for it providing a lender's policy of title insurance to the Campbells' lender; that the lender received title insurance; and that First American received premium payments. Plaintiffs also allege, critically, that the implied contract incorporated First American's statutory obligation to charge a premium in accordance with its filed rates. (See id. ¶ 57.)

---

[8] The parties agree that the written contract between Ameriquest and First American, to which the Campbells were neither parties nor beneficiaries, cannot support Plaintiffs' breach of contract claim. (See Ex. F to Compl. (Docket # 1-7).)

First American objects that Plaintiffs have failed to identify "sufficiently definite" terms of the purported implied contract. Sullivan, 861 A.2d at 631. However, as Chief Judge Carr explained in Randleman:

> [The title insurer], plaintiffs, and plaintiffs' lender were a part of an integrated refinance transaction, and plaintiff should be permitted to obtain discovery to show that all parties, including [the title insurer], knew that plaintiffs, as the borrowers, were to be charged for, and would pay, the premium. If so, and if [the title insurer] overcharged for the premium (while concurrently not informing plaintiffs that they qualified for the discount), plaintiffs may prevail on their claim of breach of an implied-in-fact contract.

465 F. Supp. 2d at 819; see also Lewis, 2007 WL 2815041, at *3-4; Barnes, 2006 WL 2265553, at *5 (analogizing to "three players on three teams involved in a three-way deal"); Lentini, 479 F. Supp. 2d at 303. Moreover, under Maine law, "[e]xisting statutes governing the subject matter of a contract must in normal circumstances be read as a constituent part thereof." Skidgell v. Universal Underwriters Ins. Co., 697 A.2d 831, 833 (Me. 1997); see also Molleur v. Dairyland Ins. Co., 942 A.2d 1197, 1201 (Me. 2008) ("A contract for insurance necessarily incorporates all relevant mandatory statutory provisions."); 24-A M.R.S.A. § 2316 (prohibiting issuance of insurance contracts in excess of filed rates). Thus, the Court follows the majority view and DENIES Defendant's Motion to Dismiss (Docket # 19) Count 2.

   **D.**  **Unjust Enrichment**

"An unjust enrichment claim is brought to recover the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." In re Estate of Miller, 960 A.2d 1140, 1147 (Me. 2008) (punctuation and internal citation omitted). To state a claim, Plaintiffs must to show that: they conferred a benefit on First American; First American

15

had appreciation or knowledge of the benefit; and the acceptance or retention of the benefit was under circumstances that make it inequitable for First American to retain the benefit without payment of its value. Id.

Plaintiffs allege that First American accepted a premium payment that it knew or had reason to know was calculated at an excessive and legally impermissible rate. First American characterizes Plaintiffs' unjust enrichment claim as an attempt "to circumvent" the remedies provided by the Insurance Code. (Def.'s Mem. in Support of Mot. to Dismiss (Docket # 19-2) at 19.) But as discussed above, this objection presupposes that Plaintiffs are obligated to exhaust those remedies before asserting common-law claims. They are not. First American has not moved to dismiss the unjust enrichment claim on any other ground.

Numerous courts have permitted similar claims to proceed to discovery. See, e.g., Hoving v. Transnation Title Ins. Co., 545 F. Supp. 2d 662, 669-70 (E.D. Mich. 2008); Mims v. Stewart Title Guar. Co., 521 F. Supp. 2d 568, 574 (N. D. Tex. 2007); Lewis, 2007 WL 2815041, at *4; Randleman, 465 F. Supp. 2d at 823-25; Barnes, 2006 WL 2265553, at *9-10. The Court joins them, and thus DENIES Defendant's Motion to Dismiss (Docket # 19) Count 3.[9]

---

[9] In limited circumstances "where the core allegations effectively charge fraud," the heightened pleading standard of Rule 9(b) may apply to state-law claims for unjust enrichment. N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009). However, Plaintiffs have not asserted any claim for fraud and the core allegations underlying Count 3 do not effectively charge fraud. Moreover, First American has not invoked Rule 9(b) as a basis for dismissing Count 3.

### IV. CONCLUSION

For the foregoing reasons, the Court ORDERS that Defendant's Motion to Dismiss (Docket # 19) is hereby DENIED.[10]

SO ORDERED.

                                                    /s/ George Z. Singal
                                                  United States District Judge

Dated this 2nd day of July, 2009.

---

[10] Although Defendant's Motion does not formally challenge Plaintiffs' money had and received claim, First American asserts that this claim "fail[s] for the same reason" as Plaintiffs' unjust enrichment claim. (Def.'s Mem. in Support of Mot. to Dismiss (Docket # 19-2) at 5.) Even if Defendant had moved to dismiss the money had and received claim, the Court's analysis of the unjust enrichment claim would apply with equal force. See F.D.I.C. v. S. Prawer & Co., 829 F. Supp. 439, 449 (D. Me. 1993); see also Treasures of the Sea, Inc. v. Johnson, 2000 WL 33677442, at *2 (Me. Super. Ct. Aug. 31, 2000) ("An action for monies had and received is proper when 'one has in his possession money in equity and good conscience belonging to another.'") (citing Ketch v. Smith, 161 A. 300, 300 (Me. 1932)).